## UNITED STATES DISTRICT COURT
### for the
### DISTRICT OF RHODE ISLAND

REBECCA JACKSON

       *v.*                                                    C.A.No.: 20-cv-
                                                                        **Plaintiff Demands a Jury Trial**

HOTEL ASSET VALUE ENHANCEMENT, INC.
d/b/a hotelAVE;
MICHELLE RUSSO and
KATHRYN MARCOTTE

## COMPLAINT

1.      This is a claim for equitable and declaratory relief and for damages for violation of the Rhode Island Fair Employment Practices Act, R.I.G.L. §28-5-1, et seq., the Rhode Island Civil Rights Act, R.I.G.L. §42-112-1 et seq., 28 U.S.C. §2000(e) and §2000(e)-3, also known as Title VII of the Civil Rights Act of 1964, the Rhode Island Whistleblowers' Protection Act § 28-50-1 et seq., and the Families First Coronavirus Response Act including specifically the Emergency Family and Medical Leave Expansion Act.

2.      The plaintiff filed a charge with the Rhode Island Commission for Human Rights, 20 ESH 203-06/06, and thereby the Equal Employment Opportunity Commission, 16J-2020-00157, and has received a Right to Sue from both Commissions and has thereby satisfied any and all administrative prerequisites to suit.

Parties

3.      Plaintiff Rebecca Jackson is a resident of the State of Rhode Island.

4.      The defendant Hotel Asset Value Enhancement, Inc. d/b/a hotelAVE is a domestic corporation with a place of business being within the State of Rhode Island.

5.     The defendant Michelle Russo is a resident of the State of Rhode Island.

6.     The defendant Kathryn Marcotte is a resident of the State of Rhode Island.

Statement of Facts

7.     Plaintiff was hired by the defendant corporation on or about May 11, 2019.

8.     Plaintiff began her employment with the defendant as the Executive Assistant to the CEO, defendant Michelle Russo.

9.     Plaintiff was hired to replace a departed employee, Allison Palombo.

10.    Upon information and belief, Allison Palombo had made, prior to her separation from employment with the defendant corporation, multiple claims of sexual harassment which claims were communicated to defendant Kathryn Marcotte, the head of Human Resources for the defendant, and defendant Michelle Russo, the CEO of the defendant.

11.    Upon information and belief, the defendants took minimal actions to remedy Ms. Palombo's claims of sexual harassment and in response thereto became hostile to Ms. Palombo, refused Ms. Palombo accrued PTO time and forced her separation from her employment.

12.    From the commencement of plaintiff's employment with the defendant corporation through to and into November 2019, plaintiff had an outstanding relationship with both Michelle Russo and Kathryn Marcotte, had positive reviews, and was on the fast track to a promotion.

13.    During the time period set forth in the preceding paragraph, the office staff of the defendant as well as Michelle Russo praised plaintiff, commented that plaintiff was the

smoothest transition they had ever experienced with a new employee and Michelle Russo often commented that it felt like plaintiff had been there for years because of plaintiff's capacity for on the job learning.

14.    During the time period set forth in paragraph 12 above, plaintiff's job duties and responsibilities were increased with positive results and continued accolades from Michelle Russo.

15.    In or about August 2019, plaintiff was given additional marketing responsibility and in or about August and September 2019,  plaintiff was informed by Kathryn Marcotte that the defendant would create a marketing role for plaintiff.

16.    In September 2019, plaintiff had a formal review with Michelle Russo which was exceptional and Michelle Russo outlined a path for plaintiff to take on a full time marketing position with the defendant in the spring.

17.    In or about November 2019, the defendant hired Kimberley Kennedy.

18.    Ms. Kennedy from her first day with the defendant engaged in consistent inappropriate gender based sexualized comments including but not limited to:

   a. That she liked having a prior male boss that she would flirt with to see if she "could get his dick hard through his khaki pants."
   b. That she "liked working around penises because they were easy to control."
   c. Openly discussed her sex life, and brought up how hard up she felt because the guy she was dating was away or moved and she needed to get fucked.
   d. Referring to Romy Bhojwani, Executive Vice President as her Romy, indicating a personal relationship and further stating "Romy and I work so well together. I like working for hot guys.  It's so much easier working for guys because you get to flirt with them."

19.     Plaintiff reported Ms. Kennedy's inappropriate behavior and the effect it was having on plaintiff's work environment and the potential for other gender based complaints to Kathryn Marcotte, the head of Human Resources for the defendant corporation.

20.     At the commencement of plaintiff's reporting of a hostile work environment caused by Ms. Kennedy, Ms. Marcotte stated "Let me guess this is about Kim?" and "I know, she is bat shit crazy. She is the craziest employee I have ever hired.  Every day she follows me out of the building when I try to go to lunch.  I feel like I need to sneak out of the building. Yesterday she told me how some guy "Cock-Blocked" her last night while she was on a date.  Then, after you left, she came in my office, sat on the desk, draped her legs up on the desk like it was a bar and laid down.  I just kind of shooed her away with my papers while she was hitting on me."

21.     Plaintiff informed defendant Marcotte that she felt uncomfortable working with Ms. Kennedy and that Ms. Kennedy was a major liability to the company.

22.     Defendant Marcotte responded "Kim's nuts and super inappropriate. But Rebecca, I don't have time to deal with this.  I can't keep hiring these employees and training them. I don't have time to deal with this crap. I have a stack of resumes right here, and she's probably the least crazy of all of them so just deal with it."

23.     The defendants' sum total response to plaintiff's report was to move Ms. Kennedy's desk down the hall to the "Shark Tank," a room with all young, male employees.

24.     The day following plaintiff's report of a hostile work environment and violations of law, defendant Marcotte was negative toward plaintiff and this was the beginning of Defendant Marcotte becoming increasingly hostile toward plaintiff.

25.     The day following plaintiff's report of a hostile work environment, Ms. Kennedy was flirting with male employees and attempting to get a number of them to go out for drinks while making sexual references.

26.     After plaintiff had reported the hostile work environment, Ms. Kennedy continued her inappropriate sexual innuendo and dialogue in the workplace.

27.     On or about November 25, 2019, plaintiff spoke formally with Kathryn Marcotte about Kimberley Kennedy's behavior for the second time, during which plaintiff stated to Ms. Marcotte that Ms. Kennedy continued to make sexually inappropriate comments and that plaintiff's work environment was being negatively affected.

28.     In response to plaintiff's report Ms. Marcotte angrily responded "You don't know how hard it is for me. You think you feel uncomfortable, you have no idea what I'M dealing with.  Michelle is texting me all night long, I have these contracts to get out for Loren, and now I have to deal with YOU.  I don't have time to deal with this stuff Rebecca. You owe me for moving her to the Shark Tank. Now I have to keep my door closed half the day because she won't shut up. I can't even imagine what she is saying to these boys and then I'll have to deal with that."

29.     In the next few weeks following plaintiff's second report of a hostile work environment, plaintiff's workload was drastically increased and assigned improperly so as to detrimentally affect plaintiff's work product.

30.     In or about November and December 2019, plaintiff's 11-year old daughter, in her first year of middle school, was diagnosed with an auto-immune disorder that was causing her to lose her hair.

31.     At plaintiff's daughter's doctor's suggestion, plaintiff and her husband began taking their daughter to therapy to help her cope with her hair loss and would make the

appointments as late as possible but plaintiff was frequently not permitted to leave work because things kept popping up at the end of the day, and plaintiff had to miss or cancel the therapy sessions.

32.     On or about December 6, 2019, plaintiff had an important mid-day doctor's appointment for her 11-year old daughter.  Plaintiff placed the appointment on the defendant's calendar and had to discuss it with defendant Russo in advance to seek special permission to leave.  Plaintiff was gone 1 hour, but when she returned Ms. Marcotte looked at her with disgust.

33.     Ms. Kennedy, commenting on plaintiff's attending a private matter stated "Private and fast…so that's the way you like it!"

34.     After plaintiff had made her reports of inappropriate conduct other hotelAVE employees were permitted to leave for doctor's appointments during the day, go out to lunch, come in late, attend children's activities, and many employees were allowed to work from home while plaintiff was negatively treated for similar activity.

35.     Around 7:30 PM on a Friday evening Ms. Russo and Ms. Marcotte and plaintiff had a meeting at which time plaintiff discussed the increased workload, and her concern that because tasks were being assigned at the end of the day, it was not permitting enough time for the documents to be appropriately completed and that the quality of work was being compromised because it was rushed.

36.     At this same meeting, plaintiff explained that she had taken the job because it was closer to home allowing her to have more time with her family to which Ms. Russo stated that she had allowed plaintiff to take her daughter to the doctor during the day, so plaintiff needed to work late to which reminded her that she was gone only one hour, didn't take lunch, and had arrived before 8:00am.

37.     At this same meeting, plaintiff requested they move forward with the marketing position as previously discussed and hire an additional team member and Ms. Russo agreed that plaintiff's job had morphed into two jobs.  Ms. Marcotte chimed in and said Ms. Kennedy could assist more to which plaintiff stated that she felt uncomfortable working with Kim because she was inappropriate sexually to which Ms. Marcotte, the head of HR, stated "Well, you'll need to work it out."

38.     In or about December 2019, defendants' treatment of plaintiff had become so severe and negative that plaintiff was suffering severe emotional distress including physical shaking, nausea, fear, stomachaches and vomiting.

39.     In or about December 2019, Ms. Kennedy made numerous statements to office staff that Ms. Marcotte was dissatisfied with plaintiff's work and held a personal dislike for plaintiff.

40.     In or about December 2019 through February 2020, Ms. Kennedy, emboldened by the failure of the defendant to act on plaintiff's report and the retaliation plaintiff was receiving, made daily loud pronouncements in front of office staff that plaintiff looked really tired/stressed and inquired if she could handle her work.

41.     During this timeframe, Ms. Marcotte had a contractor come in for proposed renovations.  At which time Ms. Marcotte stated regarding plaintiff "There's an admin. You can stick her anywhere."

42.     Plaintiff was publicly humiliated, and confused as Ms. Marcotte had, on multiple occasions, told plaintiff that she would have a private office upstairs when the company moved.

43.     On or about December 23, 2019, Ms. Russo and Ms. Marcotte  informed plaintiff that the marketing position previously to be plaintiff's position was no longer moving forward.

44.     On or about December 24, 2019 at a mandatory, onsite company gathering during office hours, Ms. Russo discussed attending a strip club and Ms. Kennedy continued her inappropriate behavior and stated "I'll dance for the dollar bills, or, we could go to the strip club together and I'll feed Michelle dollar bills!" to which Ms. Russo stated to Ms. Marcotte regarding Ms. Kennedy, "She's perfect for this place."

45.     Other office staff felt Ms. Kennedy's statements were inappropriate.

46.     Due to the increased scrutiny and retaliation, plaintiff stopped her daughter's therapy sessions because she felt too upset, scared and nervous to leave work to attend.

47.     In or about the last week of December 2019 or the first week of January 2020, plaintiff filled out paperwork so that she could attend her daughter's doctor's appointments and attend a basketball game at 4:00 pm that week to support her.  Plaintiff had ample vacation time and sick days but used her personal leave time to protect those appointments and avoid further retaliation.

48.     On or about January 8, 2020, Ms. Marcotte inquired about the plaintiff's PTO forms at which time plaintiff stated that she needed to attend these appointments with her child who was recently diagnosed with an autoimmune disorder, and plaintiff wanted to follow protocol.  Ms. Marcotte stated that she did not track PTO and had no system in place to track it and that if plaintiff wanted to do it this way, she was going to go back and retroactively deduct any time plaintiff had ever left the office, and it would not work out in plaintiff's favor.

49.     Plaintiff asked Ms. Marcotte if she did this to other employees and Ms. Marcotte confirmed that she did not at which point Ms. Marcotte became angry and demeaned plaintiff's work product.

50.     In or about late January 2020, an illness affected a number of employees in the office who missed a number of days of work with neither of them having accrued any vacation time and no sick time was deducted from them.

51.     Plaintiff was out for three days (2 for her and 1 for her daughter) and her sick time was deducted.

52.     In or about January 2020, another employee reported that two male employees had complained to Ms. Marcotte about Ms. Kennedy due to Ms. Kennedy's communications.

53.     In or about January 2020, Ms. Marcotte continued her increasingly negative behavior toward plaintiff.

54.     In or about January 2020, plaintiff's job duties were reduced to answering telephones and removed from meetings of a form and nature she had regularly previously attended.

55.     In or about January and February 2020, Ms. Marcotte continued excluding plaintiff from important meetings restricting the information provided to plaintiff and thereby affecting her ability to perform her job duties and responsibilities.

56.     In or about January 2020, there was a pole in the office, and Ms. Kennedy announced that she wanted to get drunk and ride the pole "like a cock," laughed and said, "Ha Ha! I know! I'm Soooo inappropriate."

57.     On numerous occasions, Ms. Kennedy would say to Peter Laack, "Don't you dare walk by without touching me!"

58.     Regularly and persistently, Ms. Kennedy would make inappropriate sexual comments.

59.     On or about January 27, 2020, plaintiff attended a family medical appointment and upon return to the office was informed that Ms. Kennedy was hired as a full time employee.

60.     In or about February 2020, plaintiff submitted a vacation request form for March 2020.

61.     Following plaintiff's reports of Ms. Kennedy's inappropriate actions which were causing a hostile work environment, Ms. Kennedy began overtly targeting plaintiff in an attempt to have her work product deemed unsatisfactory to the point of actively attempting to sabotage plaintiff's work product.

62.     Plaintiff provided, to Ms. Russo, factual evidence of Ms. Kennedy's attempt to sabotage plaintiff's work product and Ms. Russo dismissed it as merely accidental.

63.     Ms. Marcotte, the head of HR, improperly shared plaintiff's personal information with Ms. Kennedy.

64.     On or about February 18, 2020, there was a meeting between plaintiff, Ms. Russo, Ms. Marcotte and Ms. Kennedy wherein Ms. Kennedy made additional inappropriate comments and to which Ms. Russo and Ms. Marcotte took no action and wherein plaintiff having reported prior inappropriate actions by Ms. Kennedy decided to further refrain from making further reports as the supervisory staff was taking no action to remedy the behavior and were retaliating against plaintiff.

65.     On or about February 20, 2020, plaintiff took her husband for a surgical procedure, which leave had been pre-approved, during which time plaintiff continued to work remotely during her husband's procedure and was treated negatively as Ms. Russo stated

"Why can't you just drop him and pick him up later?" with plaintiff responding that she had put in for PTO for the rest of the day, at which point Ms. Russo retaliated by denying plaintiff's vacation request.

66.     Plaintiff sat in the ambulatory care unit while her husband's surgery was delayed because of high blood pressure, trying not to sob.

67.     On or about February 21, 2020, plaintiff's accrued vacation time was 6 days.

68.     On or about February 21, 2020, plaintiff met with Ms. Marcotte and Ms. Marcotte made false and fictitious complaints regarding plaintiff's work product and when requested to provide support for the assertions made was unable to and self-contradicted her own criticisms regarding plaintiff.

69.     On or about February 24, 2020, plaintiff was terrified to go into work after the verbal abuse received from Ms. Marcotte on Friday February 21, vomited before leaving her house, and several times at work that day.

70.     Ms. Marcotte's disdain for plaintiff was so open and obvious that a co-worker stated "Wow, Kathryn truly hates you."

71.     Plaintiff met with Ms. Russo and discussed a large portion of the ongoing issues and reports of issues received from Ms. Marcotte during which Ms. Marcotte's statements are shown to have been false.

72.     On or about February 25, 2020, Ms. Marcotte admitted that she had made false statements to plaintiff.

73.     On or about February 27 or 28, 2020, Ms. Marcotte continued her unjustified negative treatment of plaintiff that was so open and obvious that a co-worker stated "That was really uncomfortable. Guess she still truly hates your guts."

74.    In or about the first week of March 2020, plaintiff would frequently vomit at work and beforehand because the emotional distress due to the retaliation of the defendant's representatives,  she was scared to leave her desk and go to the bathroom or to take lunch.

75.    On or about March 4, 2020, plaintiff, due to the emotional distress and fear of retaliation, missed her daughter's appointment with a pediatric specialist for auto-immune disorder wherein her 11 year old daughter was faced with the potential for 3 surgical procedures.

76.    On or about March 6, 2020, plaintiff was uninvited to the Executive Meeting and told she had to answer the phone.

77.    On or about March 10, 2020, Ms. Kennedy stated that Ms. Marcotte asserted the reason employees couldn't work from home in response to COVID-19 was because plaintiff had ruined it for everyone as she used to work from home and couldn't be accounted for.

78.    The statements made about plaintiff set forth in the preceding paragraph were false and fictitious.

79.    In or about March 9 through 13, 2020, hotelAVE allowed, due to Covid-19, for employees to work from home but plaintiff continued attending the office due to her extreme fear of further retaliation, leaving her daughter home alone.

80.    On or about March 13, 2020, plaintiff requested to work from home because her daughter's school had been cancelled, due to Covid-19, and she had an auto-immune disorder and Ms. Marcotte denied the request.

81.     On or about March 16, 2020, Ms. Russo informed plaintiff that she had to continue attending work in the office, in violation of the Covid-19 related statewide orders, while all other employees were permitted to work from home.

82.     On or about March 24, 2020, plaintiff, having been suffering from a severe cold, was diagnosed with an unknown upper respiratory infection, and told to self-quarantine/isolate for 14 days and her physician provided paperwork to defendant.

83.     On or about March 25, 2020, plaintiff applied for the recently enacted H.R 6201 Public Health Emergency Leave, effective immediately and through April 3, 2020.

84.     On or about March 25, 2020, Ms. Marcotte provided that plaintiffs' request for leave would be treated as leave without pay for March 24, 2020 through March 31, 2020 and paid leave pursuant to the Family First Coronavirus Response Act for the period April 1, 2020 through April 3, 2020.

85.     On or about March 25, 2020, plaintiff's computer was deactivated, an action only taken when an employee is terminated.

86.     After March 25, 2020, Ms. Marcotte provided false and fictitious information regarding plaintiff's available leave and vacation time.

87.     Plaintiff requested appropriate and available leave under the FFCRA's Emergency Paid Sick Leave Act provisions and the Emergency and Family Medical Leave Expansion Act.

88.     Defendant's representatives falsely asserted that the provisions of the FFCRA's Emergency Paid Sick Leave Act and the Emergency and Family Medical Leave Expansion Act did not apply to the defendant.

89.     On or about April 2, 2020, Ms. Marcotte acting in her capacity as the head of HR for the defendant, terminated plaintiff for reasons that are false and fictitious.

90.     The United States Department of Labor has determined that the defendant wrongfully terminated plaintiff.

91.     Plaintiff suffered, by the actions of the representatives of the defendant, retaliation based on her protected activity in reporting discrimination based on a hostile work environment.

92.     Plaintiff, each step along her suffering discrimination, took affirmative steps to seek remedy internally and each attempt was met with apathy, disdain, refusal to act and attempts to delay and diminish plaintiff's claims.

93.     The actions of the defendants have caused plaintiff a loss of income, emotional distress and other damages.

94.     After plaintiff filed her initial charge with the Rhode Island Commission for Human Rights, the defendants did contact a witness, and former employee of hotelAVE, to some of the event set forth above, Lettie Lemoi.

95.     Upon information and belief, per the report of Ms. Lemoi, on July 17, 2020 at around 4:30pm, she received a telephone call from Kathryn Marcotte.

96.     Upon information and belief, per the report of Ms. Lemoi, during the telephone contact and discussion had with Kathryn Marcotte of hotelAVE the following was discussed:

        a.      Kathryn Marcotte asked Ms. Lemoi if she had been in contact with Rebecca Jackson.

b.      Kathryn Marcotte stated that there was some information about Rebecca Jackson that Ms. Lemoi needed to know.

c.      Kathryn Marcotte stated that "shortly after you (Lettie Lemoi) were furloughed, Rebecca Jackson released confidential and proprietary hotelAVE information to her husband who is a Marriott employee. Due to Rebecca's unorthodox behavior she was fired. However, because hotelAVE was such a wonderful company to work for, they offered her severance and would not fight her on unemployment even though she was rightfully fired."

d.      Kathryn Marcotte then stated, "Rebecca has a close, personal friend who lives in Barrington and works for the DOL named Don. Because of their relationship, she was able to get the "fired" changed to a COVID-19 release. However, she was fired."

e.      Kathryn Marcotte then stated that because of this, Rebecca Jackson was personally suing each member of the hotelAVE staff and she listed herself, Michelle Russo, Martin Reed, Loren Balsam, Maryam Sarelak, Kimberly Kennedy and others.

f.      Kathryn Marcotte stated it was terrible because this information was now public record, and poor Kim Kennedy's name was being dragged through the mud.

g.      Kathryn Marcotte told Ms. Lemoi that she must have been liked by Rebecca, because she was the only hotelAVE employee whose name was spared.

h.      Kathryn Marcotte then stated that Ms. Lemoi was listed as a witness for hotelAVE, and their lawyer would be contacting me shortly.

i.      Kathryn Marcotte stated that the Commission for Human Rights has been in constant contact with her, and her friends at the Commission stated that the case is frivolous.

j.      Kathryn Marcotte then stated that each member of hotelAVE planned to file a personal lawsuit against Rebecca Jackson directly, following this lawsuit, for slander.

97.    Upon information and belief, per the report of Ms. Lemoi, after the telephone call from Kathryn Marcotte, Ms. Lemoi received a telephone call from Kimberly Kennedy.

98.    Upon information and belief, per the report of Ms. Lemoi, she recorded the telephone call from Kimberly Kennedy on her old iPhone.

99.    Upon information and belief, per the report of Ms. Lemoi, during the telephone contact and discussion had with Kimberly Kennedy of hotelAVE the following was discussed:

   a.    Kimberly Kennedy told Ms. Lemoi that Rebecca Jackson is a psychopath and Kimberly Kennedy stated that she immediately recognized this because Rebecca parked illegally at her old work and bragged about it.

   b.    Kimberly Kennedy stated that Rebecca Jackson left early and that she constantly had to cover by completing Rebecca Jackson's work.

   c.    Kimberly Kennedy stated that Rebecca Jackson constantly made errors on her work and that she had to fix them.

   d.    Kimberly Kennedy stated that she was familiar with the Commission of Human Rights because she had personally filed a lawsuit against her ex-employer and that because of this, she was highly sensitized to inappropriate sexual behavior, and would never say anything inappropriate in the workplace.

100.    The actions of the defendants constitute a violation of the Rhode Island Fair Employment Practices Act, R.I.G.L. §28-5-1, et seq., the Rhode Island Civil Rights Act, R.I.G.L. §42-112-1 et seq., 28 U.S.C. §2000(e) and §2000(e)-3, also known as Title VII of the Civil Rights Act of 1964, the Rhode Island Whistleblowers' Protection Act § 28-50-1 et seq., and the Families First Coronavirus Response Act including specifically the Emergency Family and Medical Leave Expansion Act.

## COUNT I
*Discrimination – 42 U.S.C. §2000e (Title VII of the Civil Rights Act of 1964)*

101.   Plaintiff restates all previous paragraphs by reference as if stated fully herein.

102.   The defendant corporation did violate Title VII by the facts described herein, by discriminating against her with respect to hire, tenure, compensation, terms, conditions or privileges of employment because of her gender.

103.   As a result, she has suffered and continues to suffer damages.

WHEREFORE, plaintiff respectfully requests this Honorable Court award her compensatory damages and all other damages authorized by statute, as well as her costs of litigation and reasonable attorneys' fees pursuant to statute.

## COUNT II
*Retaliation – 42 U.S.C. §2000e (Title VII of the Civil Rights Act of 1964)*

104.   Plaintiff restates all previous paragraphs by reference as if stated fully herein.

105.   The defendant corporation did violate Title VII by the facts described herein, by retaliating against her because she opposed a practice forbidden by 42 U.S.C. §2000(e) and engaged in protected activity in the form of complaints of discrimination.

106.   As a result,  she has suffered and continues to suffer damages.

WHEREFORE, plaintiff respectfully requests this Honorable Court award her compensatory damages and all other damages authorized by statute, as well as her costs of litigation and reasonable attorneys' fees pursuant to statute.

## COUNT III
### *Discrimination - R.I.G.L. § 28-5-1 et seq.*

107.    Plaintiff restates all previous paragraphs by reference as if stated fully herein.

108.    The defendant corporation did violate R.I. Gen. Laws §28-5-6, the Rhode Island Fair Employment Practices Act ,by the facts described herein, by discriminating against her with respect to hire, tenure, compensation, terms, conditions or privileges of employment because of her gender.

109.    As a result, she has suffered and continues to suffer damages.

WHEREFORE, plaintiff prays this Honorable Court award her compensatory and consequential damages pursuant to Rhode Island General Laws 28-5-24(b) including but not limited to lost income and punitive damages pursuant to Rhode Island General Laws 28-5-29.1 as well as her costs of litigation and reasonable attorneys' fees pursuant to Rhode Island General Laws § 28-5-24(a) and such other relief as the Court deems appropriate.

## COUNT IV
### *Retaliation - R.I.G.L. § 28-5-1 et seq.*

110.    Plaintiff restates all previous paragraphs by reference as if stated fully herein.

111.    The defendant corporation did violate R.I. Gen. Laws §28-5-6(5), the Rhode Island Fair Employment Practices Act, by the facts described herein, by discriminating against her because she opposed a practice forbidden by FEPA and engaged in protected activity in the form of complaints of discrimination.

112.    As a result,  she has suffered and continues to suffer damages.

WHEREFORE, plaintiff prays this Honorable Court award her compensatory and consequential damages pursuant to Rhode Island General Laws 28-5-24(b) including but not limited to lost income and punitive damages pursuant to Rhode Island General Laws 28-5-29.1 as well as her costs of litigation and reasonable attorneys' fees pursuant to Rhode Island General Laws § 28-5-24(a) and such other relief as the Court deems appropriate.

## COUNT V
*Discrimination - RIGL §42-112-1 et seq,*

113.   Plaintiff restates all previous paragraphs by reference as if stated fully herein.

114.   The defendants did violate R.I.G.L. §42-112-1, the Rhode Island Civil Rights Act "RICRA", by the facts described herein, by discriminating against her with respect to hire, tenure, compensation, terms, conditions or privileges of employment because of her gender.

115.   As a result,  she has suffered and continues to suffer damages.

WHEREFORE, plaintiff prays this Honorable Court award her compensatory, consequential and exemplary damages as well as the costs of litigation and reasonable attorneys' fees pursuant to Rhode Island General Laws § 42-112-2 and such other relief as the Court deems appropriate.

## COUNT VI
*Retaliation - RIGL §42-112-1 et seq,*

116.   Plaintiff restates all previous paragraphs by reference as if stated fully herein.

117.   The defendants did violate R.I.G.L. §42-112-1, the Rhode Island Civil Rights Act "RICRA", by the facts described herein, by the facts described herein, by discriminating

against her because he opposed a practice forbidden by RICRA and engaged in protected activity in the form of complaints of discrimination.

118.   As a result, she has suffered and continues to suffer damages.

WHEREFORE, plaintiff prays this Honorable Court award her compensatory, consequential and exemplary damages as well as the costs of litigation and reasonable attorneys' fees pursuant to Rhode Island General Laws § 42-112-2 and such other relief as the Court deems appropriate.

## COUNT VII

*Rhode Island Whistleblowers' Protection Act RIGL § 28-50-3(4)*

119.   Plaintiff restates all previous paragraphs by reference as if stated fully herein.

120.   Plaintiff did report to her supervisors the improper actions of a co-worker in violation of the Rhode Island Fair Employment Practices Act, R.I.G.L. §28-5-1, et seq., the Rhode Island Civil Rights Act, R.I.G.L. §42-112-1 et seq., and 28 U.S.C. §2000(e) and §2000(e)-3, also known as Title VII of the Civil Rights Act of 1964.

121.   The defendant corporation did violate the Rhode Island Whistleblowers' Protection Act § 28-50-3(4) with respect to the plaintiff by subjecting her to adverse work actions in retaliation for the plaintiff's protected activities.

122.   As a result, the plaintiff has suffered and continues to suffer harm.

WHEREFORE, plaintiff prays this Honorable Court award her compensatory and consequential damages, reinstatement, the payment of back wages, full reinstatement of fringe benefits and seniority rights, actual damages, or any combination of these remedies pursuant to Rhode Island Whistleblowers' Protection Act §28-50-4. Plaintiff further prays this Honorable Court award her all of the costs of litigation, including attorneys' fees

pursuant to Rhode Island Whistleblowers' Protection Act §28-50-5 and all other relief available by statute and such other relief as the Court deems appropriate.

## **COUNT VIII**

*Families First Coronavirus Response Act and the*
*Emergency Family and Medical Leave Expansion Act,*
*H.R. 6201 (Division C)*

123.   Plaintiff restates all previous paragraphs by reference as if stated fully herein.

124.   Plaintiff did submit and apply for leave pursuant to the Families First Coronavirus Response Act and specifically the Emergency Family and Medical Leave Expansion Act.

125.   Plaintiff was an eligible employee under the Families First Coronavirus Response Act and specifically the Emergency Family and Medical Leave Expansion Act.

126.   The defendants did violate the Families First Coronavirus Response Act and the Emergency Family and Medical Leave Expansion Act with respect to the plaintiff by subjecting her to adverse work actions in retaliation for exercising her rights under the leave provisions of the Acts.

127.   As a result, the plaintiff has suffered and continues to suffer harm.

WHEREFORE, plaintiff prays this Honorable Court award her compensatory and consequential damages, the payment of back wages and front wages, and liquidated damages. Plaintiff further prays this Honorable Court award her all of the costs of litigation, including attorneys' fees pursuant to and all other relief available by statute and such other relief as the Court deems appropriate.

## **PLAINTIFF DEMANDS A TRIAL BY JURY**

Respectfully submitted,
Rebecca Jackson,
By and through her attorney,

David S. Cass, #5044
One Davol Square, 4ᵗʰ Floor
Providence, RI 02903
(508) 889-2674
Fax:  (401) 272-2708
david@davidcasslaw.com